## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

TERESA A. NANRY,

                Plaintiff,

v.                                            ACTION NO. 2:17cv83

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

      Teresa A. Nanry ("Nanry") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

      An order of reference assigned this matter to the undersigned. ECF No. 6. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Nanry's motions for summary judgment and/or remand (ECF Nos. 8–9) be DENIED and that the Commissioner's motion for summary judgment (ECF No. 11) be GRANTED.

# I. **PROCEDURAL BACKGROUND**

Plaintiff, Teresa A. Nanry, protectively filed applications for disability insurance benefits and Supplemental Security Income on January 31 and February 15, 2013, respectively, alleging that she became disabled on November 30, 2012, due to post-traumatic stress disorder ("PTSD"), anxiety, depression, and assorted back problems (degenerative disc disease, herniated disc, severe back pain, bulging disc injury, and lumbar and cervical spine impairment).[1]   R. 294–308, 367.  Following the state agency's denial of these claims, both initially and upon reconsideration, Nanry requested a hearing before an Administrative Law Judge ("ALJ").   R. 90–153, 208–09. ALJ O. Price Dodson initially heard the matter on March 9, 2015 and issued a decision denying benefits on April 8, 2015.   R. 64–89, 154–66.   Upon review, on July 15, 2015, the Appeals Council vacated the ALJ's decision and remanded, directing the ALJ to "[g]ive further consideration to the claimant's maximum mental residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations . . . ."   R. 173–75.  On November 16, 2015, ALJ Dodson held a second hearing and received testimony from Nanry (who testified at the previous hearing and was represented by counsel) and an impartial vocational expert.   R. 44–63.  On December 18, 2015, the ALJ denied Nanry's claim for benefits, finding that she was not disabled from November 30, 2012 through the date of the decision.   R. 22–37.

On January 6, 2017, the Appeals Council denied Nanry's request for review of the ALJ's decision.    R. 1–6.    Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.   *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.  Having exhausted all administrative remedies, Nanry filed a complaint

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court.

with this Court on February 8, 2017.  ECF No. 1.  The Commissioner answered on June 8, 2017.

ECF No. 4.  In response to the Court's order, the parties filed motions for summary judgment,[2]

with supporting memoranda, on July 7 and August 7, 2017, respectively.  ECF Nos. 8–10, 11–

12.  As neither party has indicated special circumstances requiring oral argument, the case is

deemed submitted for a decision.

## II. RELEVANT FACTUAL BACKGROUND

### A.    *Background Information and Hearing Testimony by Teresa Nanry*

Born in 1967, Nanry completed her high school education, and was 44 years old as of the

onset date of disability of November 30, 2012.  R. 67, 294, 368.  In January and February 2012,

Nanry received treatment for back and neck pain resulting from an automobile accident.[3]  R.

426–32.   Nanry  testified  that,  before  being  terminated  from  her  last  job  due  to  excessive

absences stemming from her "physical issues," her past relevant work included employment as a

medical assistant, a receptionist in doctors' offices and a hair salon, a photographer, and as a

contract painter.  R. 68–70; *see also* R. 336, 357–60.  She has not worked since the onset of her

alleged disability.  R. 68, 368.

Nanry testified that she lives with her husband and adult son.  R. 67.  With respect to

physical ailments, she first testified about having problems with her back and knees.  R. 75.

Nanry reported having pain throughout her back, including sharp, stabbing pain and pain that

radiates down her leg.  R. 75.  Nanry also testified that, due to shoulder problems, she had pain,

arm weakness, and difficulty scratching her back and moving her arm towards her back.  R. 74,

---

[2] Nanry moves, alternatively, that the Court remand the matter to the Commissioner for further
proceedings.  ECF No. 9.

[3] The record reflects that another driver ran into the rear end of Nanry's vehicle as she came to a
stop while exiting an interstate highway.  R. 429, 431.

78–79.  With respect to her knees, Nanry reported having pain in both knees, but noted that the pain in her right knee was more intense and attributed it to an arthroscopic procedure "years ago" and to a crooked right kneecap.  R. 75–77.  Nanry also testified that she experienced pain that radiated down her left arm into her elbow and that the last two fingers on her left hand remain numb.  R. 79, 476 (noting chronic paresthesia in the two fingers due to an injury sustained from an automobile accident before 2012).  When asked about taking medications for these ailments, Nanry testified that she takes Advil and sometimes uses an icepack, but that she could not afford to see a doctor.  R. 76.

Mentally, Nanry testified to suffering from stress, anxiety, and depression.  R. 74, 77.  Nanry testified that, due to the accident, the prospect of driving aggravated these conditions and noted that she takes prescription anti-anxiety medications.  R. 77–78.  She also attributed some anxiety and depression due to her inability to engage in other activities like she used to do.  R. 80.  She reported having occasional memory problems, which she addresses by writing things down, and some problems concentrating, but mostly only bad days when experiencing pain and distress.  R. 80.

With respect to daily activities, Nanry reported fitfully sleeping on a couch due to back, shoulder, and knee pain.  R. 52, 70–71, 74.  She testified to typically sleeping three and one-half hours per night.  R. 53.  She reported having no fixed schedule and said that, on bad days, she did little and reclined due to physical and mental fatigue.  R. 54, 71, 82.  On good days, Nanry testified that she performed minor chores, such as dish washing or light cleaning or starting laundry.  R. 50–51, 71–73 (noting also the inability to perform outdoor chores such as lawn care or other chores requiring her to get on her knees).  Nanry reported that she still possessed a driver's license and drove occasionally.  R. 48–49, 68.  For example, she advised that she

sometimes went shopping, but mostly did so with others who were available to load and unload her car. R. 73. She testified that she engaged in no social activities and that she no longer engaged in any hobbies, but did care for her three dogs on a daily basis. R. 71, 73.

After the passage of time from the first to the second hearing before the ALJ, Nanry reported that she rarely had "good days" any more and found it more difficult to do any cleaning activities. R. 50–51, 53–54. Nanry also testified to having crying spells three to four days per week, which last from thirty minutes to three to four hours. R. 53. At the second hearing, Nanry stated that the farthest she could walk at one time was approximately across a parking lot. R. 54. She also reported that she could stand for roughly ten minutes, after which her feet turned red and her toes became numb. R. 54. If able to regularly change position, Nanry advised that she could sit for approximately twenty minutes. R. 54–55. She also testified that the condition of her shoulders prevented her from lifting more than two or three pounds. R. 55. Nanry concluded by stating that, over the course of three to four years, she had attempted to do everything necessary to improve, but her body continued to deteriorate. R. 56–57.

In an adult function report dated December 3, 2012, Nanry noted limitations similar to those described above and advised that she lost her job "due to medical issues [on] Nov[ember] 30, 2012." R. 336. She reported having anxiety, depression, and chronic back pain, which affected her capacities to bend, use her left leg, carry and lift items, sit and stand for long periods of time, sleep, care for family members, clean house, shop, drive, and work. R. 336–40, 343. As a result, Nanry reported that she felt worthless, was short-tempered, socially isolated, had difficulty focusing on and completing tasks, and did not want to interact with anyone. R. 336, 343, 345. Nanry noted that she occasionally prepared "quick meals" to avoid standing for too long, went outside "maybe 2 times a week" due to her reluctance to drive or ride in a car, did

5

laundry by sitting on the floor in order to transfer clothes from the washer to the dryer, and shopped for groceries "maybe 1 time a month." R. 338–40. Aside from these activities, Nanry reported spending her days doing nothing, other than occasionally watching television, playing computer games, and attending medical appointments. R. 336, 342.

## B.  *Relevant Medical Evidence[4]*

### 1.  *Curtis Bryan, M.D. – Treating Psychiatrist*

Beginning several weeks after the automobile accident noted above, Curtis R. Bryan, M.D., treated Nanry from approximately February 4, 2012 through October 22, 2015. R. 469–72, 610–12. During 2012, 2013, and 2014, Dr. Bryan treated Nanry on three to four occasions per year. R. 467–72, 511, 527–28, 589, 591–92, 595–96. During 2015, Dr. Bryan treated Nanry on approximately ten occasions. R. 599, 610–27, 649. During most of these appointments, Dr. Bryan's treatment notes reflect that Nanry presented: (1) with a normal gait and station, intact language, full orientation, logical thought processes, intact associations, and an average fund of knowledge; (2) with a constricted affect and moods ranging from dysphoric to dysphonic to euthymic; and (3) as either well or poorly dressed and groomed, typically dependent on her symptoms and conditions at any given time. R. 467–68, 471, 527–28, 532–33, 589, 591–92, 595–97, 599, 610, 613, 616, 618, 620, 622, 624, 626, 649–50.

After first assessing Nanry on February 4, 2012, Dr. Bryan diagnosed her as suffering from an acute stress reaction to the automobile accident and prescribed Ativan for anxiety and Ambien for insomnia. R. 469–72. On August 11, 2012, when Nanry returned complaining of back pain, depression, and flashbacks and anxiety when driving, Dr. Bryan diagnosed PTSD and

---

[4] Because Nanry's motion does not challenge the ALJ's findings concerning her physical impairments, ECF No. 10 at 2 n.6, the Court focuses upon her mental health treatment record.

attention deficit disorder ("ADD"), not otherwise specified ("NOS"), and prescribed lamotrigine, citalopram, Ativan, Ambien, and Adderall.  R. 468.  Following an October 6, 2012 appointment, Dr. Bryan continued the prior diagnoses.[5]  R. 467.

On February 20, 2013, Dr. Bryan completed the first of two impairment questionnaires, based upon Nanry's treatment from February 2012 to January 2013.  R. 511–18.  He reported diagnoses of PTSD, depressive disorder NOS, and ADD NOS, with a guarded prognosis, and a GAF score of 57.[6]  R. 511.  Dr. Bryan identified the clinical findings supporting his diagnoses as poor memory, sleep and mood disturbances, thought or concentration difficulty, social isolation or withdrawal, persistent anxiety and irrational fears, decreased energy, and intruding recollections of a traumatic event.  R. 512.  He also identified anxiety as Nanry's primary and most significant symptom.  R. 513.  With respect to Nanry's ability to sustain mental activities during a normal workday and workweek, Dr. Bryan noted:  (1) primarily mild limitations with respect to memory and understanding;[7] (2) primarily moderate limitations with respect to

---

[5] On November 30, 2012, Nanry spoke with Dr. Bryan by phone and reported being upset due to losing her job.  R. 467.

[6] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and indicates an overall assessment of a person's psychological, social, and occupational functioning.  Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR), 34 (4th ed. 2000).  The following ranges are linked to the following symptomology: (1) 91–100—no symptoms, superior functioning; (2) 81–90—absent or minimal symptoms, good functioning; (3) 71–80—transient symptoms, no more than slight impairment in functioning; (4) 61–70—some mild symptoms, generally functioning pretty well; (5) 51–60—moderate symptoms and moderate functional difficulties; (6) 41–50—serious symptoms and serious functional impairments; and (7) 31–40—"some impairment in reality testing or communication . . . and major impairment in several areas" of functioning.  *Id.*  The DSM-V abandoned the use of GAF scores as a diagnostic tool for characterizing patient functioning due to the questionable probative value of the scores.  Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

[7] Dr. Bryan assessed, however, that Nanry was moderately limited in her ability to understand and remember detailed instructions.  R. 515.

sustaining concentration and persistence;[8] (3) primarily moderate limitations with respect to social interactions;[9] and (4) primarily mild limitations with respect to adaptation.[10]  R. 514–16. Finally, Dr. Bryan reported that Nanry was capable of handling a low level of work stress, would have good and bad days, and was likely to be absent from work two to three times per month.  R. 517–18.

After an April 29, 2013 appointment at which Nanry reported "feeling bad" and reported doing worse over the last month due to spousal abuse, Dr. Bryan continued the previously prescribed medications, but substituted Prozac for citalopram going forward.  R. 528.  At that time, Dr. Bryan noted that Nanry's anxiety disorder with PTSD features was worse, and her depressive disorder and ADD were both stable.  R. 528.  On August 16, 2013, Nanry exhibited a euthymic mood and Dr. Bryan noted her depressive disorder as "improved," her anxiety disorder with PTSD features as "slightly improved," and her ADD as "stable."  R. 527.  On November 9, 2013, when Nanry reported decreasing levels of anxiety, except for high anxiety while driving, and described her mood as eight out of ten (with ten identified as happy), Dr. Bryan continued the previous diagnoses and medications and listed her depression as "improved."  R. 596.

---

[8] Dr. Bryan reported, however, marked limitations in Nanry's ability to maintain attention and concentration for extended periods and "to complete a normal workweek without interruptions from psychologically[-]based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  R. 514.

[9] Dr. Bryan assessed, however, that Nanry was only mildly limited in her abilities to ask simple questions and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  R. 514.

[10] Dr. Bryan assessed, however, that Nanry was moderately limited in her ability to respond appropriately to changes in the workplace.  R. 514.

During a February 1, 2014 appointment, Dr. Bryan noted that Nanry said that her depression was "in control," she was sleeping "OK," and that she continued to have pain and anxiety while driving. R. 595 (noting also "[a]ffect constricted and mood euthymic"). Noting that Nanry's anxiety disorder was "unimproved," while her depression and ADD were stable, Dr. Bryan increased Nanry's dosage of lamotrigine. R. 595. On March 29, 2014, Nanry reported feeling worse due to pain and its impact on her ability to sleep. R. 592. While classifying Nanry's depression as "in partial remission," Dr. Bryan continued her on Ativan, Ambien, and Adderall, and prescribed an increased dose of Prozac. R. 592. Dr. Bryan's notes from a September 19, 2014 appointment reflect that Nanry continued to report increased anxiety when driving and insomnia and he continued her on the same medications. R. 591. Three months later on December 13, 2014, Nanry continued to report increased anxiety when driving, intermittent insomnia, having low energy and appetite levels, and decreased concentration (due to taking less Adderall due to cost). R. 589. Dr. Bryan noted her mood as "mildly dysphoric and anxious" and listed his diagnoses as ADD NOS, depression "in partial remission," and anxiety disorder NOS with PTSD features "in partial remission" and continued Nanry on the same medications. R. 589–90.

On February 14, 2015, Nanry advised Dr. Bryan that she was in a poor mood due to marital issues, but that her anxiety was "a little better," when not driving, and that medication helped with her sleep. R. 599. Dr. Bryan assessed her mood as "dysphonic and anxious" and noted that Nanry was "sloppily dressed and groomed" and had difficulty completing serial 7 subtractions. R. 599. He continued his prior diagnoses and medications (increasing the dosage of Prozac), but also noted various symptoms including flashbacks to the accident, chronic feelings of being unsafe, decreased social interactions, poor concentration, irritability, low

energy, and an inability to focus upon and finish tasks. R. 599–600.

On February 14, 2015, Dr. Bryan completed a second impairment questionnaire. R. 602–06. It reported the same diagnoses and many of the same signs and symptoms reported on the February 20, 2013 questionnaire. R. 511–12, 602–03. Dr. Bryan also noted that Nanry exhibited low energy levels and inattention and characterized her depression and anxiety as being "the most frequent and/or severe." R. 603–04, 606. In assessing the degree to which Nanry's conditions limited her mental abilities in a typical work week, Dr. Bryan made check-the-box findings similar to those previously noted. R. 514–16, 605. With respect to concentration and persistence, however, Dr. Bryan noted that: (1) Nanry's ability to maintain attention and concentration for extended periods had improved from markedly to moderately limited; (2) her ability "to complete a normal workweek without interruptions from psychologically[-]based symptoms" had improved from markedly to moderately limited; and (3) her ability to perform at a consistent pace was now assessed as moderately to markedly limited. R. 514–16, 605. With respect to social interactions, however, Dr. Bryan noted that: (1) Nanry's ability to ask simple questions or for help had decreased from mildly to moderately limited; and (2) her ability to adhere to basic standards of neatness and cleanliness had decreased from mildly to moderately to markedly limited. R. 514, 605. With respect to adaptation, Dr. Bryan assessed that Nanry's ability to adapt had deteriorated from mildly to moderately limited in several respects. R. 514, 516, 605. Finally, he increased the likelihood that Nanry would miss work to more than three days per month. R. 518, 606.

10

On March 4, 2015, Nanry's condition remained largely unchanged from her prior appointment.[11] R. 649–50. Dr. Bryan assessed Nanry's GAF score at 35 and listed stressors that included unemployment, low income, lack of health insurance, her marital situation and lack of a support system, and the difficulties posed by her mental limitations on her activities of daily living. R. 651. Dr. Bryan prescribed a trial of Pristiq and reduced her dosage of Prozac. R. 651–52.

From April 2 through October 22, 2015, during approximately eight appointments with Dr. Bryan, Nanry's mental health condition remained largely the same, with occasional fluctuations, due to life events and changes in her symptoms, conditions, and medications. R. 610–27. As before, Dr. Bryan occasionally changed dosages and substituted and/or prescribed new medications, including Pristiq, escitalopram, and Brintellix, based upon their effectiveness and side effects reported by Nanry. R. 610–19, 622–27.

On October 6, 2015, Dr. Bryan completed a medical evaluation for the Commonwealth of Virginia's Supplemental Nutrition Assistance Program Employment and Training ("SNAPET") and reported his primary and secondary diagnoses as major depressive disorder and PTSD, respectively. R. 663–64. Dr. Bryan opined that Nanry was unable to participate in employment and training activities in any capacity in the following six months due to her "poor concentration, fatigue, and depressed mood" and recommended that she apply for disability benefits. R. 663–64.

---

[11] Dr. Bryan's diagnosis now specified Nanry's depression as a major depressive disorder, recurrent/severe without psychotic features. R. 650.

11

**2.     *Counselling with Pamela Zane, Ph.D. – Treating Psychologist,
and D.C. Meekings – Licensed Professional Counselor***

From February 22, 2012 through December 21, 2012, Nanry also received counseling

and treatment at the Behavioral & Neuropsychiatric Group, Inc., with D.C. Meekings, L.P.C.,

and Pamela Zane, Ph.D.   R. 558, 562–75.   During regular therapy sessions from February

through December 2012, Mr. Meekings made observations similar to those made by Dr. Bryan,

including noting Nanry's emotional dysregulation, her physical pain, her increasing frustration

and agitation, her sleep disturbances, her decreasing stability, and the adverse effects of her

condition on her physical and cognitive functioning, relationships, work abilities, and activities

of daily living. R. 558, 562–69, 572–75.  In an October 8, 2012 letter to an attorney representing

Nanry with regard to the car accident, Mr. Meekings noted that Nanry "has spent many hours of

'eyeball to eyeball' individual therapy sessions with her therapist [and] has been unable to 'pick

up the pieces' and bring any semblance of closure or decrease in re-experiencing the crash."  R.

570–71.

On December 3, 2012, Nanry also received counseling from Dr. Zane.  R. 559–61.  On

that date, Nanry reported, among other things:  (1) disc problems and back pain due to the

January 2012 car accident; (2) a prior 2010 car accident that caused some muscular pain; (3) a

developmental history of ADD and hyperactivity and a three-year history of taking Adderall; and

(4) having recurrent dreams and flashbacks of car accidents.  R. 559–60.  Dr. Zane's mental

status examination indicated that Nanry complained of depression, crying, low self-esteem,

insomnia, loss of interest and energy, feelings of worthlessness, and decreased appetite.  R. 560.

Dr. Zane diagnosed PTSD, major depression, general anxiety disorder, and insomnia.  R. 561.

To further assess Nanry, Dr. Zane directed that she undergo MMPI-2[12] and other testing on December 4 and 7, 2012. R. 550–56, 558. The MMPI-2 testing revealed findings consistent with physical concerns, a depressed mood, a high degree of stress, extreme fatigue, reliance on denial and repression to deal with anxiety and conflict, a negative world view, loss of interest in and pleasure from life, social and emotional withdrawal, and concerns about an inability to function in life. R. 555–56. The test report also noted that "[a]lthough the MMPI-2 clinical scale profile is probably valid, it may show some exaggeration of symptoms." R. 555. Further, it noted that Nanry's "response pattern suggests that she may have answered items in the latter part of the MMPI-2 in an exaggerated manner, possibly invalidating that portion of the test." R. 555. On December 18, 2012, Dr. Zane's notes reflect that "IQ results just confirm [Nanry's] ADD she is majorly depressed." R. 558.

On February 27, 2013, Dr. Zane completed an impairment questionnaire pertaining to Nanry's treatment at her practice from February 2012 through February 2013. R. 541–48. Dr. Zane diagnosed Nanry with PTSD, major depression, insomnia, panic disorder with agoraphobia, ADD, and obsessive-compulsive disorder, reported her prognosis as "fair to poor," and assigned her a GAF score of 45. R. 541. Dr. Zane noted positive clinical findings for many of the same findings made by Dr. Bryan, and additionally noted findings for appetite disturbance with weight change, personality change, recurrent panic attacks, anhedonia or pervasive loss of interests, paranoia, suicidal ideations, nightmares, flat affect, compulsions, and hostility and irritability. R. 512, 542. Dr. Zane noted that the MMPI-2 test results supported her diagnoses pertaining to depression, somatic pain, and paranoia and that IQ test results were indicative of ADD. R. 542,

---

[12] MMPI-2 refers to the Minnesota Multiphasic Personality Inventory test of adult personality and psychopathology. R. 551–56.

547.   Dr. Zane identified Nanry's panic attacks, anxiety, and depression as Nanry's most frequent and/or severe symptoms and stated that, in times of high anxiety, Nanry's obsessive-compulsive behaviors and ADD became more observable and resulted in higher levels of dysfunction.   R. 543.   With respect to Nanry's ability to sustain mental activities during a normal workday and workweek, Dr. Zane noted:   (1) primarily marked limitations (two out of three) with respect to memory and understanding; (2) primarily marked limitations (six out of eight) with respect to sustaining concentration and persistence; (3) primarily marked limitations (three out of five) with respect to social interactions; and (4) moderate and marked limitations with respect to adaptation.   R. 544–46.   Dr. Zane also reported that Nanry was withdrawn socially and extremely anxious, particularly around persons in authority or in a position to criticize her.   R. 546–47.   Finally, Dr. Zane reported that Nanry was incapable of handling even a low level of work stress, due to PTSD and the paralysis resulting from panic attacks and depression, would have good and bad days, and was likely to be absent from work more than three times per month. R. 547–48.   Dr. Zane concluded by noting that Nanry was "not capable of working." R. 548.

### 3.   *Consultative Examination and State Agency Physician Reviews*

On June 5, 2014, Nanry drove herself 25 miles to Norfolk, Virginia, for a consultative psychological evaluation with Karen Armstrong, Ph.D., a licensed clinical psychologist.[13]   R. 577–79.   In conjunction with her examination, Dr. Armstrong reviewed the impairment questionnaire prepared by Dr. Zane, some of the above-described treatment notes of Dr. Bryan and Mr. Meekings, a letter prepared by Mr. Meekings, and documentation pertaining to the termination of Nanry's prior employment.   R. 577.   Dr. Armstrong also obtained a lengthy history of Nanry's physical and mental condition and personal and family history.   R. 577–78.

---

[13] Nanry reported that she rarely took trips of that length and that this was the first time she had driven in the preceding ten days. R. 577.

This included information about:  (1) her January 2012 car accident; (2) her condition and treatment after that event; (3) her mental health history, including treatment for depression and anxiety dating back to her early 20s; (4) her prior history of a back injury and pain; (5) her chronic anxiety and use of Ativan before driving; (6) other life stressors, including physical pain (treated with Advil), marital issues, parental ill health, and isolation; (7) the limiting effects of her condition on her ability to lift and sit/stand for prolonged time periods and to do household chores and go grocery shopping; and (8) her typical and limited daily activities, which involved mostly sitting and reclining on a couch and using her computer. R. 577–78.

Dr. Armstrong's mental status examination found Nanry:  (1) appropriately groomed; (2) able to sit, stand, and walk adequately and without making "obvious pain accommodations"; (3) alert and oriented; (4) with adequate verbal skills and intelligible speech; (5) able to perform basic verbal abstractions; (6) able to engage in practical reasoning and perform most simple math calculations; (7) with a normal rate of speech and unremarkable rate of thinking; (8) without obviously impaired judgment or insight; and (9) with a broad affect and a depressed and anxious mood. R. 578–79.  In this regard, Dr. Armstrong noted that Nanry presented in a manner "consistent with Dr. Bryan's notes" and exhibited "adequate" credibility, but apparently was "functioning somewhat better" than reported by Dr. Zane, suggesting "at least slight improvement" since February 2013. R. 548, 579.  Dr. Armstrong indicated that Nanry's anxiety and depression appeared to be chronic problems that were exacerbated by recent life events. R. 579.  She diagnosed Nanry with unspecified depressive disorder, unspecified attention-deficit/hyperactivity disorder, and unspecified anxiety disorder, with PTSD features. R. 579.

With respect to Nanry's functional state, Dr. Armstrong opined that:  (1) she appeared capable of doing simple and possibly moderately complex tasks given the state of her memory,

cognition, and attention; (2) notwithstanding her ADD, with treatment she appeared able to perform "at least basic tasks"; (3) notwithstanding her self-reported inability to work, she did not exhibit problems following directions, understanding what she was asked to do, keeping focused upon such tasks, and remembering relevant information; (4) problems with pain and mood would likely interfere with regular attendance and the consistent performance of tasks at work; (5) she indicated no past problems with getting along with co-workers, supervisors, and the public and appeared capable of understanding a supervisor's requests; and (6) taking into account the apparent gradual improvement of her condition over time, Nanry's ability to tolerate the demands of a competitive workplace environment was moderately limited. R. 579.

On May 20, 2013, state-agency physician, Daniel Walter, Psy.D., assessed Nanry's mental residual functional capacity ("RFC"). R. 97–98. Dr. Walter found that she had no limitations in memory or understanding. R. 97. With respect to concentration and persistence, Dr. Walter found that Nanry was not significantly limited with respect to her ability to carry out short and simple or detailed instructions, to sustain an ordinary routine, to work with others, and to make simple work-related decisions. R. 97–98. He also found Nanry was moderately limited in maintaining attention and concentration for extended time periods, in performing within a schedule and maintaining attendance, and in completing a normal workday and workweek without interruption from psychological conditions and while maintaining a consistent work pace without an unusual number of rest breaks. R. 98. Dr. Walter identified Nanry's anxiety as a factor that could impact her work attendance and consistency. R. 98. With respect to social interaction, Dr. Walter found no significant limitation in Nanry's ability to seek help and ask simple questions and in maintaining appropriate behavior and appearance. R. 98. He also found moderate limitations in Nanry's ability to interact with the public, to deal with supervision, and

to tolerate interaction with co-workers, due to "short-temperedness secondary to pain and anxiety." R. 98.   Finally, Dr. Walter found that Nanry had no limitations with respect to adaptation. R. 98.

On July 8, 2014, David Deaver, Ph.D., another state agency expert, reviewed the record and made findings similar to Dr. Walter's.[14] R. 129–31.  He additionally noted that Nanry could maintain concentration, persistence, and pace "with 1-2 step instructions" not requiring frequent contact with others and opined that she was capable of "at least simple, unskilled work." R. 130.

## C.   *Hearing Testimony of Vocational Expert Barbara Byers*

At the hearing before the ALJ, Barbara Byers, a vocational expert ("VE"), responded to the ALJ's hypothetical questions concerning the availability of jobs for a person of Ms. Nanry's age, education, and past work experience, who is capable of light exertion, but limited to performing routine, repetitive tasks in an environment not involving fast-paced production, the operation of motor vehicles or direct interaction with the public, and who is limited to only occasional bending, stooping, or crouching and without overhead reaching. R. 58–59.  VE Byers testified that jobs in the light and unskilled level of work existed in the national economy for a person having such a profile in the occupations of mail clerk, cafeteria attendant, and agricultural produce sorter. R. 58–59.

VE Byers also testified that, if the same hypothetical person was subject to the additional limitation of no more than sedentary exertion, jobs in the sedentary and unskilled level of work also existed in the national economy in the occupations of document preparer and sedentary assembler. R. 59.   If the same hypothetical person required frequent, unscheduled breaks

---

[14] Dr. Deaver determined that Nanry was moderately limited in her ability to follow detailed instructions and to work with others, findings that exceeded those from Dr. Walter. R. 97–98, 130.

causing her to be off task for more than 15% of the day, however, VE Byers testified that there would be no jobs. R. 59. Further, in response to a question from claimant's counsel, VE Byers testified that the competitive work environment generally would permit no more than one to two absences from work per month on a routine basis. R. 60.

### III. THE ALJ's DECISION

To evaluate Nanry's claim of disability,[15] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the ALJ considered whether Nanry: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 25–37.

The ALJ found that Nanry met the insured requirements[16] of the Social Security Act through December 31, 2017, and she had not engaged in substantial gainful activity since November 30, 2012, her alleged onset date of disability. R. 27–28.

---

[15] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *accord* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a). A claimant seeking SSI due to a disabling condition must also establish financial need, among other requirements. *See* 42 U.S.C. § 1383.

[16] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social

At steps two and three, the ALJ found that Nanry had the following severe impairments: (a) depression; (b) anxiety; (c) PTSD; (d) degenerative disc disease; and (e) ADD. R. 28. The ALJ classified any additional impairments as non-severe, because they responded to medication or required no significant medical treatment or did not otherwise continuously impose functional limitations upon her. R. 28. The ALJ further determined that Nanry's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 28–30.

The ALJ next found that Nanry possessed the RFC to perform sedentary work, *see* 20 C.F.R. §§ 404.1567(a), 416.967(a), subject to the limitations that she: (a) can "perform only occasional bending, stooping, and crouching"; (b) "should avoid reaching overhead"; (c) "is limited to performing routine and repetitive tasks"; (d) "should avoid direct interaction with the general public"; (e) "should avoid fast paced production work"; and (f) "should avoid the operation of motor vehicles." R. 30. Based upon this RFC assessment, the ALJ determined at step four that Nanry could not return to her past relevant work as a medical assistant, receptionist, or photographer. R. 35.

Finally, at step five, and after considering her age, high school education, work experience, and RFC, the ALJ found that Nanry could perform other jobs, such as a document preparer and assembler, which existed in significant numbers in the national economy. R. 35–36. Accordingly, the ALJ concluded that Nanry was not disabled from November 30, 2012 through the date of the ALJ's decision and was ineligible for a period of disability, DIB, or SSI benefits. R. 36–37.

---

Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

## IV. STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V. ANALYSIS

### A.    *The ALJ properly evaluated the medical opinion evidence.*

In her first claim of error, Nanry argues that the ALJ erred in failing to properly evaluate the medical opinion evidence and adhere to the treating physician rule. Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 10 at 12–17.  Specifically, Nanry argues that the ALJ erred in rejecting the opinions of Nanry's treating providers, failing to account for the consultative examiner's opinion that Nanry would have difficulties in regularly attending and consistently performing work, and improperly according great weight to the opinion of non-examining state agency mental health experts. *Id.*

The regulations provide that, after step three of the ALJ's five-part analysis but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. §§ 404.1545(a), 416.945(a).  The RFC is a claimant's maximum ability to work despite her limitations. *Id.* at §§ 404.1545(a)(1), 416.945(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work. *Id.* at §§ 404.1545(a)(5), 416.945(a)(5).  The determination of RFC is based upon a consideration of all the relevant medical and other evidence in the record. *Id.* at §§ 404.1545(a)(3), 416.945(a)(3).[17]

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions[18] of treating providers.  For claims like Nanry's,

---

[17] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(a), 416.929(a).

[18] "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your . . . impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).  An "acceptable medical source"

filed before March 27, 2017,[19] a treating provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017).   Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.  However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491, 1996 WL 374188 (S.S.A.).

When an ALJ assigns other than controlling weight to a treating provider's opinion, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *4.  The main factors are:  (1) the examining relationship, giving more weight to sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence presented in support of the opinion; (4) consistency with the record; and (5) the

---

includes a licensed physician or psychologist, but not a licensed counselor.   20 C.F.R. § 404.1502(a).  Evidence from medical sources other than an acceptable medical source, such as a licensed therapist, will be considered to show the severity of the individual's impairments and how they affect the ability to function.  SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A.); 20 C.F.R. § 404.1502(d) (defining a "medical source" to include one who is state licensed and engaged in a scope of practice authorized by federal or state law).

[19] On January 18, 2017, SSA promulgated a final rule that revised its medical evidence rules, including the treating physician rule, and specified that the revisions apply to claims filed on or after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017).

specialization of the physician.   20 C.F.R. §§ 404.1527(c), 416.927(c) (also noting ALJ's

obligation to "give good reasons . . . for the weight" given to a treating source opinion); *see*

*Brown v. Comm'r of Soc. Sec.,* 873 F.3d 251, 256 (4th Cir. 2017) (noting that the first two

factors are "specific to treating sources," while the latter three apply to evaluating medical

opinions from both treating and non-treating sources).

By regulation, the ALJ must also explain the weight assigned to *all* opinions, including

treating sources, non-treating sources, state agency consultants, and other non-examining

sources.   20 C.F.R. §§ 404.1527, 416.927.   Therefore, when the ALJ's decision is not fully

favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion,
> supported by the evidence in the case record, and must be sufficiently specific
> to make clear to any subsequent reviewers the weight the adjudicator gave to
> the treating source's medical opinion and the reasons for that weight.

SSR 96-2p.  This specificity requirement is necessary because a reviewing court

> face[s] a difficult task in applying the substantial evidence test when the
> [Commissioner] has not considered all relevant evidence. Unless the
> [Commissioner] has analyzed all evidence and has sufficiently explained the
> weight he has given to obviously probative exhibits, to say that his decision is
> supported by substantial evidence approaches an abdication of the court's "duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d

396, 397 (4th Cir. 1974)).

Nanry broadly attacks the ALJ's treatment of the opinions of Drs. Bryan and Zane—her

treating providers.  Rather than according these opinions controlling weight, Nanry argues that

the ALJ "wholly rejected" and declined to give them "any probative weight" for invalid reasons.

Pl.'s Mem. 13.  While acknowledging that "Ms. Nanry had some improvement with treatment

and that her conditions were described as 'stable' or in 'partial remission,'" Nanry argues that the

ALJ failed to differentiate between modest improvement in a clinical setting and a real world ability to perform substantial gainful activity in the workplace. *Id.* at 13–14. Additionally, Nanry argues that the ALJ erred in entirely discounting Dr. Zane's opinions on the basis of equivocal MMPI test results, which suggested that Nanry may have exaggerated her symptoms. *Id.* at 13–15. Further, Nanry argues that, even if the ALJ correctly decided not to ascribe controlling weight to the treating providers' opinions, he nevertheless neglected to defer to and properly assess those opinions based upon the multiple factors specified by regulation. *Id.* at 17; *see* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Nanry also attacks the ALJ's decision to accord "significant weight" to the opinions of state agency mental health consultants, arguing that they should have been given the least weight, both because the consultants never treated Nanry and because they opined about her condition prior to full development of the record. Pl.'s Mem. 16. Finally, Nanry argues that, while crediting the consultative examiner's (Dr. Armstrong) opinion that Nanry retained certain non-exertional functional capacities for work, the ALJ erred in failing to address her opinion that Nanry's pain and mood problems would likely interfere with her attendance and performance of work on a regular basis. *Id.* at 15–16. Having carefully reviewed the record, the Court rejects Nanry's arguments for the reasons discussed below.

Initially, the Court notes that Nanry's broad assertions that the ALJ "wholly rejected" and gave no "probative weight" to the treating source opinions are inaccurate. *Id.* at 13. In fact, and as noted elsewhere in Nanry's brief, *id.*, the ALJ decided to give their opinions "little," rather than no weight. R. 34. Contrary to Nanry's suggestion, this distinction matters because the opinions of Drs. Bryan and Zane are multi-faceted, rather than unitary. The record reflects that the ALJ evaluated them on multiple levels in a manner not fully captured by simply using labels

24

such as "little" or "none."  For example, the ALJ accepted the treating providers' primary diagnoses regarding Nanry's depression, anxiety, PTSD, and ADD.[20]  R. 28, 511, 561, 602–03. Similarly, in reviewing the paragraph B criteria of the mental health listings, the ALJ found that the record indicated that Nanry had mild to moderate difficulties in activities of daily living, social functioning, and concentration, persistence, and pace, a difference amounting to a matter of degree, not kind, from Dr. Bryan's medical source statements of February 2013 and 2015.  R. 29–30, 514–18, 602–05.  Further, in determining Nanry's RFC and considering the improvement of her conditions over time (as discussed below) and their responsiveness to medication, the ALJ accounted for limitations identified by Dr. Bryan and recognized that she could not return to her past relevant work.  R. 30–35.  To address concerns regarding Nanry's attention, pace, and concentration, the ALJ limited her to sedentary, routine, and repetitive work, in an environment not requiring fast-paced production.  R. 30, 605; *see, e.g., Eastwood v. Colvin*, No. 3:15v156, 2016 WL 805709, at *4 (E.D. Va. Feb. 12, 2016) (finding that ALJ adequately accounted for limitations in concentration, persistence, and pace with hypothetical specifying, among other things, work at a non-assembly line pace).  The ALJ also addressed her difficulties dealing with others by limiting Nanry to no interaction with the general public.  R. 30, 605.  Finally, consistent with Dr. Bryan's identification of Nanry's anxiety while driving as a primary symptom, the ALJ also specified that she avoid the operation of motor vehicles at work.  R. 30, 513.

On the other hand, having determined that Nanry retained sufficient RFC to engage in sedentary work under certain conditions, the ALJ necessarily rejected Drs. Bryan and Zane's opinions that Nanry was unable to work.  R. 30–36, 548, 663 (noting that Nanry could not work

---

[20] The ALJ did not find Nanry's insomnia and Dr. Zane's later diagnosed panic disorder with agoraphobia and obsessive-compulsive disorder to be severe impairments.  R. 28, 541, 561.

and recommending that she apply for disability benefits).  In this respect, Nanry's claim that the ALJ "wholly rejected" these opinions and gave them no "probative weight" is correct.  Pl.'s Mem. 13.  Nanry's argument, however, fails to recognize that a treating provider's opinion that a claimant suffers from a disabling impairment and cannot work touches upon a matter reserved by regulation to the Commissioner, who is responsible for making disability determinations.  *See* 20 C.F.R. § 404.1527(d) (discussing "issues reserved to the Commissioner").  Therefore, although the Commissioner will consider "the medical findings and other evidence" giving rise to an opinion that a claimant is disabled, such an opinion neither controls nor is accorded "special significance" by the SSA. 20 C.F.R. §§ 404.1527(d)(1), (d)(3), 416.927(d)(1), (d)(3).

With this backdrop in mind, the Court turns to Nanry's more specific challenges to the ALJ's handling of Drs. Bryan and Zane's opinions.  With respect to Dr. Zane, Nanry's suggestion that the ALJ decided to mostly discard Dr. Zane's opinions based *solely* upon the results of the MMPI testing is not well-supported.  Pl.'s Mem. 13.  First and foremost, the ALJ observed that Dr. Zane's opinion was "largely inconsistent with the overall evidence of record."  R. 34.  This is evident, for example, when comparing Dr. Zane's February 2013 opinion to Dr. Bryan's February 2013 opinion.  In assessing the extent of Nanry's limitations with respect to twenty aspects of mental activity concerning memory, concentration and persistence, social interaction, and adaptation, Dr. Zane assessed Nanry as having marked limitations in thirteen of the twenty activities.  R. 544–46.  That same month, however, Dr. Bryan assessed Nanry's limitations with respect to the very same mental activities and noted only two marked limitations.  R. 514–16.[21]  As noted by the consultative examiner, Dr. Armstrong (whose June

---

[21] Even two years later, and using a different scale, Dr. Bryan assessed moderate to marked limitations with respect to only six of the thirteen mental activities identified by Dr. Zane.  R. 544–46, 605.  Further, Dr. Bryan found no limitations at that time that qualified exclusively as

2014 opinion was assigned "significant weight"), Nanry presented "in a manner consistent with Dr. Bryan's notes" and "seemed to be functioning somewhat better than described in the report by Dr. Zane." R. 34, 579.

Dr. Zane's opinion was also inconsistent with Dr. Bryan's regular mental status examinations of Nanry, which typically found, at a minimum, full orientation, intact language, speech of normal prosody, an unremarkable gait and station, logical thought processes, intact associations, an average fund of knowledge, developing insight and judgment, and also noted the absence of suicidal or homicidal ideations, hallucinations, delusions, or psychotic processes. R. 471, 528, 532–33, 589, 591–92, 595–97, 599, 610, 613, 616, 618, 620, 622, 624, 626, 649–50.

Additionally, Dr. Zane (as well as Dr. Bryan) appeared to credit Nanry's self-report concerning her back condition, along with its concomitant effects upon her mental condition. R. 541 (noting four "bulging discs," "degenerative disc," and "herniated with encroachment on nerve"), R. 547 (stating Nanry "has multiple disc disorder which [is] painful"), R. 560 (noting "herniated" and "bulging" discs); *see also* R. 504 ("'herniated disc is resting on . . . nerves'"), 511 (noting "herniated discs"), R. 602–04 (noting "herniated discs," "depression [and] anxiety may make pain worse," and fired from job due to "pain issues"). The ALJ noted, however, based upon information not presented to Dr. Zane (or Dr. Bryan) and not currently contested by Nanry that: (1) while MRIs "revealed degenerative disc disease," the images showed the disease was "mild" with "only mild encroachment of the neural foramina," R. 33, 415–16, 421; (2) the physical consultative examination "did not consistently substantiate the severity of [her] alleged complaints," R. 32, 584; and (3) the treatment received for her back issues was "conservative,"

---

"marked" with respect to any of the twenty-three mental activities he evaluated and found "moderate to marked" limitations in only eight of those activities. R. 605.

R. 33.[22]  Based upon the foregoing, the ALJ's finding that Dr. Zane's opinion was at odds with the record is well-supported.

The results of the MMPI testing also support the ALJ's decision to attribute less weight to Dr. Zane's opinion.  Those results indicated that Nanry's "response pattern [during the test] suggests that she may have answered items in the latter part of the MMPI-2 in an exaggerated manner, possibly invalidating that portion of the test."  R. 555.  Notwithstanding this, Dr. Zane identified the MMPI as diagnostic testing that supported her February 2013 assessment of Nanry's mental impairments.  R. 542.  Notably, Dr. Zane did so having only personally treated Nanry on one occasion (December 3, 2012), before conducting the MMPI testing on December 4, 2012, and on a few occasions thereafter, R. 550–56, 558–61, and without addressing questions about the validity of the test results or any possible exaggeration of Nanry's condition.  Although Nanry contends that "not a single medical source in the record suggested that Ms. Nanry was exaggerating," Pl.'s Mem. 14, the ALJ correctly noted information in the record supporting just such an inference.  R. 32–34.  This includes the results of the physical consultative examination, which the ALJ found "did not consistently substantiate the severity of [her] alleged complaints."  R. 32–33, 584.  It also includes evidence that, notwithstanding her reported high levels of driving-related anxiety, *see, e.g.,* R. 468, 513, 595–96, 599, Nanry drove 25 miles for a consultative examination with Dr. Armstrong in June 2014, R. 34, 577.  Inasmuch as such evidence suggests that Nanry may have overstated her symptoms, the ALJ's concern about the

---

[22] Based partly upon such findings, the ALJ determined that Nanry could perform sedentary work.  R. 33.  Such findings, as well as the ALJ's apparent concern about Nanry's overstatement of her symptoms (discussed below), also speak to why the ALJ determined that Nanry retained sufficient RFC to perform sedentary work, notwithstanding Dr. Armstrong's finding that Nanry's *pain* and mood problems would likely interfere with regular attendance and consistent performance of work.  R. 579.  Therefore, the Court rejects Nanry's argument that the ALJ failed to explain why this aspect of the consultative examiner's opinion did not preclude a finding of disability.  Pl.'s Mem. 15.

extent to which Dr. Zane's opinion rested upon possibly invalid MMPI test results was well-founded.

Nanry also attacks the ALJ's treatment of Dr. Bryan's opinions arguing, in essence, that the ALJ gave too much weight to his views concerning the improvement in her depression, anxiety, and PTSD, while undervaluing his medical source statements to the extent they conflict therewith. Pl.'s Mem. 13–14. The Court disagrees. When completing his February 2013 medical source statement, Dr. Bryan identified Nanry's anxiety as her primary and most frequent and severe symptom. R. 513. The record reveals that Nanry primarily exhibited this anxiety while driving, R. 468, 595–96, 599, and as time passed this condition improved. R. 34, 527 (noting in August 2013 that anxiety disorder with PTSD had "slightly improved"), 589–90 (noting in December 2014 that anxiety disorder was "in partial remission"). Indeed, as further noted by the ALJ, this same improvement was observed by the consultative examiner, Dr. Armstrong, who reported that Nanry drove herself 25 miles to the June 2014 examination. R. 34, 577. These changed circumstances, over two years after the triggering accident, differ materially from an isolated, positive observation in a treatment record, such as in the cases cited by Nanry. Pl.'s Mem. 14; *See, e.g., Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (finding that "hopeful remarks" in clinic notes indicating a claimant was doing "fairly well" or "quite well" were insufficient to undermine a treating provider's opinion of psychiatric disability).

Similar analysis applies with respect to Nanry's depression and ADD. Once again, in August 2013, Dr. Bryan reported that Nanry's depressive disorder had improved and that her ADD was stable.[23] R. 527. And, by December 2014, Dr. Bryan reported that Nanry's depression was also in partial remission. R. 589–90. Although Dr. Bryan's February 2015

---

[23] As noted by the ALJ with respect to ADD, early in her treatment Nanry indicated that taking Adderall improved her concentration level "'tremendously.'" R. 32, 469.

medical source statement reported that Nanry's anxiety and depression continued to exist, that statement lacks detail and fails to elaborate upon or explain the basis for any change in the status of Nanry's anxiety and depression from the time that Dr. Bryan had classified them as improved and in partial remission. R. 602–06; *see Cummins v. Colvin*, No. 2:14cv165, 2015 WL 1526188, at *3 (E.D. Va. Apr. 2, 2015) (noting "not a distaste for check-the-box forms generally, but for medical reports that do not contain at least a minimal amount of written explanation" and finding that ALJ correctly discounted a physician's diagnosis supported "with nothing more than a Plaintiff's subjective claims"). Therefore, to the extent that Nanry contends that Dr. Bryan's medical source statements compel a finding of disabling impairments, the ALJ had sufficient grounds for concluding otherwise and for giving little weight to this aspect of Dr. Bryan's opinion, in the absence of an explanation and due to Nanry's improving impairments with medication management, R. 32, and her "slow but positive response to treatment," R. 34. *See Gross v. Heckler*, 785 F.2d 1163, 1165–66 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). Further, as discussed above, the ALJ's findings regarding the overstatement of Nanry's conditions also support the ALJ's finding that her limitations were not as extensive as opined by Dr. Bryan.

Lastly, with respect to the treating providers, the record shows that, having determined to accord their opinions less than controlling weight, the ALJ adequately deferred to them, when appropriate, and weighed those opinions pursuant to the factors specified in 20 C.F.R. §§ 404.1527(c) and 416.927(c). As noted above, the ALJ accepted the examining providers' diagnoses and recognized, like the providers, that Nanry had genuine limitations with respect to certain non-exertional functioning. Although the ALJ misidentified Dr. Zane's degree (as D.O. rather than Ph.D.), the ALJ examined and discussed the key records arising from her limited

treatment relationship with Nanry, including her intake examination notes, R. 34, 559–61, the MMPI test results, R. 551–56, and her February 2013 medical source statement, R. 541–48.[24]  R. 34.  As discussed above, the ALJ also addressed the supportability of Dr. Zane's opinions and their consistency with the record and found them wanting.  R. 34.  The ALJ also identified Dr. Bryan's credentials and indirectly recognized the extent of the treating relationship, by noting Nanry's "well-documented history of mental impairments" and by citing to and discussing treatment records and source statements from 2013, 2014, and 2015.  R. 28–30, 32–34.

Finally, the ALJ also committed no error in assigning "significant weight" to the administrative findings of Drs. Walter and Deaver, the non-examining state agency consultants. R. 33–34.  Although SSA's regulations indicate that greater weight typically will be given to the opinion of a treating source, rather than a non-treating source, 20 C.F.R. § 404.1527(c)(1), they also direct that an ALJ must consider the opinions of such experts in disability evaluation, 20 C.F.R. § 404.1513a(b)(1), and weigh them based upon the support provided therefor and their evaluation of the evidence of record, 20 C.F.R. § 404.1527(c)(3).

Both state agency consultants found that Nanry's conditions imposed limitations upon her ability to engage in substantial gainful activity, R. 97–98, 129–30, which were less substantial than those assessed by Dr. Bryan (and Dr. Zane).  Again, the differences noted (with respect to Dr. Bryan) were more a matter of degree than kind.  Dr. Walter found, for example, that Nanry had no significant limitations in her ability to carry out instructions, to sustain an ordinary routine, to work with others, and make simple work-related decisions, while simultaneously finding she was moderately limited in maintaining attention and concentration for extended periods and in working without rest breaks and interruptions due to her

---

[24] The ALJ also discussed and cited to the treating records of D.C. Meekings, a licensed counselor working in the same practice as Dr. Zane.  R. 32.

psychological conditions. R. 97–98. Similarly, Dr. Deaver found Nanry capable of performing "at least simple, unskilled work" and maintaining concentration and pace "with 1-2 step instructions," provided that her interactions with others were infrequent. R. 130. Based upon the ALJ's review of the entire record and for the reasons discussed above, the Court finds no error in the ALJ's treatment of these opinions. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (stating that an ALJ may rely upon a non-examining physician's opinion to the extent it is consistent with the record).

The related claim that, because these opinions preceded the full development of the record, the ALJ erred in assigning weight to them, Pl.'s Mem. 16, also misses the mark. By the time Drs. Walter and Deaver examined the record, Nanry's conditions were manifest and well-documented. Also, both doctors accurately identified and discussed the primary issues (anxiety, concentration, pace, and interaction) highlighted by Nanry's other caregivers. Further, the improvement in Nanry's condition after Drs. Walter and Deaver so opined, as reviewed by the ALJ and as discussed above, supports, rather than detracts from, those opinions. Having considered the state agency medical opinions in conjunction with later acquired information, the ALJ properly accounted for the same in determining Nanry's RFC. *See O'Donnell ex rel. O'Donnell v. Comm'r of Soc. Sec.*, 113 F. App'x 475, 478 (3d Cir. 2004) (holding that the ALJ could rely upon the opinions of state agency physicians who did not have access to a report as long as the ALJ considered the report, along with other evidence of record, in assessing RFC).

For all of these reasons, the Court finds that the ALJ's evaluation of the medical opinion evidence is supported by substantial evidence and involved no legal error.

**B.**     ***Substantial evidence supports the ALJ's finding that Nanry's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely credible.***

Nanry next asserts that the ALJ relied upon boilerplate language and incorrectly found her statements about the intensity, persistence, and limitations resulting from her symptoms "not totally credible" based upon the same, alleged faulty findings concerning her improving condition, the significance of MMPI testing, and Nanry's driving to a doctor's appointment. Pl.'s Mem. 18–19.

In assessing such statements, an ALJ must engage in the two-step inquiry detailed in 20 C.F.R. § 404.1529 by evaluating:  (1) whether an underlying medically determinable impairment was established by objective medical evidence that could reasonably be expected to produce a claimant's symptoms, and (2) if so, the extent to which such symptoms limited a claimant's functioning and ability to work, based upon their intensity, persistence, and limiting effects. *See Lewis*, 858 F.3d at 865–66; *Craig*, 76 F.3d at 593–95.  At the second step, an ALJ must "assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)).  To evaluate the intensity and persistence of a claimant's symptoms, the ALJ must consider all the evidence, including the objective medical evidence, the claimant's daily activities, various facets of any asserted pain (including its intensity, location, and frequency), any events giving rise to symptoms, medical treatments and medications and their effectiveness, any other pain relief measures, and other factors about the claimant's functional limitations and restrictions due to pain.  20 C.F.R. §§ 404.1529(c), 416.929(c).  In conducting this inquiry, an ALJ cannot discount a claimant's subjective evidence of pain intensity based solely upon objective medical findings. *Lewis*, 858 F.3d at 866 (citations omitted).

33

Nanry challenges the ALJ's analysis at step two described above primarily on grounds which the Court has previously considered. To the extent Nanry also argues that the ALJ gave short shrift to and relied upon a boilerplate conclusion in declining to accept Nanry's statements at face value, Pl.'s Mem. 18, the Court rejects such a claim. The ALJ thoroughly reviewed Nanry's statements about her limitations and carefully compared them with the medical evidence, her daily activities, her medical and mental health treatment and consultative examination records, the utility and nature of her medication regimen, and other evidence. R. 30–35. Thus, this is not a case in which the ALJ discounted a claimant's subjective report of symptoms simply due to a lack of documentation therefor in the objective medical evidence.

Although Nanry correctly argues that the fact that she could occasionally drive does not render her statements incredible, Pl.'s Mem. 19, the ALJ made no such finding. Instead, he found only that Nanry's self-report of symptoms and complaints was "not totally credible." R. 31, 33. As discussed above and when viewed in light of the entire record, Nanry's driving activity not only tends to confirm that one of her primary conditions had improved, but also supports the ALJ's assessment that Nanry had overstated her limitations. That assessment dovetails closely with test results also suggesting exaggeration of Nanry's symptoms. R. 555. Where, as here, the ALJ did not rely upon these isolated facts, but instead evaluated them in light of the all of the evidence, the Court finds that the ALJ performed the required analysis, properly evaluated Nanry's credibility, and that substantial evidence supports the finding that Nanry was not disabled during the relevant time period.

## VI.  **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment and/or remand (ECF Nos. 8–9) be DENIED and the Commissioner's motion for summary judgment (ECF No. 11) be GRANTED.

## VII.  **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____

Robert J. Krask

United States Magistrate Judge

Robert J. Krask

UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 31, 2018